UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSEPH A. FRANKENBERGER,

                                        Plaintiff,


                    -vs-                                        02-CV-0820C


JO ANNE B. BARNHART,
Commissioner of Social Security,

                                        Defendant.

---

        Plaintiff Joseph A. Frankenberger initiated this action pursuant to 42 U.S.C. § 405(g)

seeking a review of the determination of the Commissioner of Social Security ("the

Commissioner") denying plaintiff's application for Social Security disability insurance

("SSDI") benefits.[1]   The Commissioner has filed a motion (Item 10) for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and plaintiff has

filed a cross-motion (Item 13) for summary judgment pursuant to Fed. R. Civ. P. 56.[2]  For

the following reasons, the Commissioner's motion is granted, and plaintiff's cross-motion

is denied.

---

        [1]This case was transferred to the undersigned by order of the Hon. Richard J. Arcara dated
October 26, 2006 (Item 17).

        [2]Rule 56(c) provides for summary judgment to "be rendered forthwith if the pleadings, depositions,
answers to interrogatories on file, together with the affidavits, if any, show that there is no genuine issue
as to any material fact and that the moving party is entitled to a judgment as a matter of law."  However,
the court's review under 42 U.S.C.§ 405(g) is generally regarded as more suited to the procedural posture
of a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), since the administrative
record on review is routinely submitted as part of the government's answer to the complaint, and the
materials contemplated by Rule 56 are not ordinarily available for such review.  Accordingly, the court will
consider plaintiff's cross-motion as a motion brought pursuant to Rule 12(c).

## BACKGROUND

Plaintiff was born on March 30, 1951 (T. 130).[3]  He applied for SSDI benefits on March 9, 2000, alleging disability as of June 11, 1999 (T. 130-32), due to a combination of back pain, neck pain, and a hearing impairment (T. 20).  He has a long history of employment at Quebecor Printing (formerly Arcata Graphics), and last worked in June 1999 when he was laid off from his job as a lithographic stripper (T. 24).

Plaintiff's SSDI application was denied initially on May 22, 2000 (T. 90-93), and again on reconsideration (T. 97-99).  Plaintiff requested a hearing, which was held on June 11, 2001 before Administrative Law Judge ("ALJ") Timothy M. McGuan (T. 36-87).  Plaintiff testified at the hearing, and was represented by Josephine A. Greco, Esq.  Mr. Jay Steinbrenner, a vocational expert, also testified at the hearing.

On November 28, 2001, the ALJ found that plaintiff was not under a disability within the meaning of the Social Security Act (T. 16-32).  The ALJ determined that plaintiff suffered from low back pain with radiation into the right lower extremity, neck pain, high frequency sensorineural hearing loss, right rotator cuff tendinitis with impingement, and carpal tunnel syndrome, but that this combination of impairments, while "severe,"did not meet or equal the criteria of any impairment listed at 20 C.F.R. § 404 Subpart P, Appendix 1 ("the Listings") (T. 30).  The ALJ then found that, for the period from June 11, 1999 to January 8, 2001, plaintiff retained the residual functional capacity to perform a significant range of light work, and for the period from January 9, 2001 to the date of the hearing

---

[3]References preceded by "T." are to page numbers of the transcript of the administrative record, filed by defendant as part of the answer to the complaint.

determination, plaintiff retained the residual functional capacity to perform a significant range of sedentary work (T. 30-31).    According to the ALJ, plaintiff's medically determinable impairments and residual functional capacity did not preclude him from performing his past relevant work as a black and white print operator at any time during the entire period of his alleged disability (T. 31).  Alternatively, relying on the testimony of the vocational expert, the ALJ found that there were a significant number of jobs in the national economy that plaintiff could perform considering his age, education, vocational training, transferable skills, and residual functional capacity for a range of either light or sedentary work (T. 31).

The ALJ's decision became the Commissioner's final determination on September 27, 2002, when the Appeals Council declined plaintiff's request for review (T. 6-7).   On November 19, 2002, plaintiff commenced this action seeking judicial review of the denial of his SSDI application.

## DISCUSSION

### I.    Scope of Judicial Review

The Social Security Act states that upon district court review of the Commissioner's decision, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  Substantial evidence is defined as evidence which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Tejada v. Apfel*, 167 F.3d 770, 773-72 (2d Cir. 1999).  Under these standards, the scope of judicial review of the Commissioner's decision

is limited, and the reviewing court may not try a case *de novo* or substitute its findings for those of the Commissioner. *See Richardson*, 402 U.S. at 401.  The court's inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. *Winkelsas v. Apfel*, 2000 WL 575513, at *2 (W.D.N.Y. February 14, 2000) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." *Gartmann v. Secretary of Health and Human Services*, 633 F. Supp. 671, 680 (E.D.N.Y. 1986) (quoting *Klofta v. Mathews*, 418 F. Supp. 1139, 1411 (E.D.Wis. 1976)).  The Commissioner's determination cannot be upheld when it is based on an erroneous view of the law that improperly disregards highly probative evidence. *See Tejada*, 167 F.3d at 773.

## II.    Standard for Determining Eligibility for Disability Benefits

To be eligible for disability insurance benefits under the Social Security Act, plaintiff must show that he suffers from a medically determinable physical or mental impairment "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The impairment must be  "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1505(a).

The Social Security regulations set forth a five-step process to be followed when a disability claim comes before an ALJ for evaluation of the claimant's eligibility for benefits. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is presently engaged in substantial gainful activity. If the claimant is not, the ALJ must decide if the claimant has a "severe" impairment, which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). If the claimant's impairment is severe, the ALJ then determines whether it is severe enough to meet or equal the criteria of an impairment found in the Listings. If the impairment meets or equals a listed impairment, the claimant will be found to be disabled. If the claimant does not have a listed impairment, the fourth step requires the ALJ to determine if, notwithstanding the impairment, the claimant is capable of performing his or her past relevant work. Finally, if the claimant is not capable of performing the past relevant work, the fifth step requires that the ALJ determine whether the claimant is capable of performing other work which exists in the national economy, considering the claimant's age, education, past work experience, and residual functional capacity. *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *Reyes v. Massanari*, 2002 WL 856459, at *3 (S.D.N.Y. April 2, 2002).

The claimant bears the burden of proof with respect to the first four steps of the analysis. If the claimant demonstrates an inability to perform past work, the burden shifts to the Commissioner to show that there is other work in the national economy that the claimant can perform. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). This burden may be met by resort to the medical vocational guidelines set forth at 20 C.F.R. Pt. 404,

Subpart P, App. 2 (the "Grids").[4]  However, where the Grids fail to describe the full extent of a claimant's physical limitations, the ALJ must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).

In this case, as outlined above, the ALJ determined that the plaintiff has not engaged in substantial gainful employment since the alleged disability onset date of June 11, 1999 (T. 30).  Upon review of plaintiff's medical records and hearing testimony, the ALJ found plaintiff's combination of aliments (*i.e.*, low back pain with radiation into the right lower extremity, neck pain, high frequency sensorineural hearing loss, right rotator cuff tendinitis with impingement, and carpal tunnel syndrome) to be severe, but not of sufficient severity to meet or equal any of the impairments in the Listings (*id.*).

Proceeding to step four of the evaluation process, the ALJ determined that plaintiff's residual functional capacity had changed over time.  Specifically, the ALJ found that from June 11, 1999 to January 8, 2001, plaintiff could sit for up to six hours; stand and/or walk for up to two hours in an eight hour day, alternating positions at will; and lift up to twenty pounds occasionally.  Plaintiff also had several "nonexertional" limitations during this period which affected his ability to bend, squat, climb, and crawl, and required him to avoid concentrated exposure to noise and extreme cold temperatures (T. 27, 30).  The ALJ then found that during the period from January 9 to November 28, 2001, plaintiff's capacity for lifting weight diminished from twenty to ten pounds, and additional nonexertional limitations

---

[4]The Grids were designed to codify guidelines for considering residual functional capacity in conjunction with age, education and work experience in determining whether the claimant can engage in any substantial gainful work existing in the national economy.  *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *see also Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

were introduced–specifically, no overhead reaching and avoidance of concentrated exposure to wetness (T. 72, 30-31).  Based on this assessment, the ALJ determined that plaintiff retained the capacity throughout the period of alleged disability to perform his past relevant work as a black and white print operator, which the vocational expert identified as "semiskilled, sedentary work" (T. 27; *see also* T. 31).

The ALJ then proceeded to step five of the evaluation process, considering plaintiff's age (50 years old at the time of the hearing), education (high school graduate with vocational training as a lithographic stripper), transferable skills from his past work, and residual functional capacity for a significant range of light work during the period from June 11, 1999 to January 8, 2001, diminishing to a significant range of sedentary work during the period from January 9 to November 28, 2001 (T. 28, 31).  Based on these factors, and relying on the vocational expert's testimony, the ALJ determined that there were a significant number of jobs in the economy that plaintiff could perform, requiring a finding of not disabled within the meaning of the Social Security Act at any time throughout the date of the decision (T. 32).  The ALJ indicated that he had considered plaintiff's allegations and testimony regarding his functional limitations, and gave credence to his subjective complaints of pain, but found that the overall medical evidence did not support his complaints "to the degree alleged" (T. 26; *see also* T. 30).

Plaintiff seeks reversal of this determination, arguing that the ALJ made the following errors:

1.     Failure to properly assess the opinions of plaintiff's treating physicians.

2.     Failure to properly assess plaintiff's credibility, especially with respect to his allegations of pain.

-7-

3..     Failure to properly assess the disabling effect of the combination of plaintiff's impairments.

4.      Failure to properly assess plaintiff's capacity to perform work.

Each of these grounds is discussed in turn below, following a brief summary of the medical evidence in the record before the court.

## III.   Medical Evidence

The historical medical evidence in the record reveals that on December 21, 1979, plaintiff injured his back while operating a printing unit at work.  He was examined by Dr. Patrick Kelly, M.D., on January 23, 1980, whose impression was "lumbar radiculopathy, primarily S1, due to herniated disc most likely at L5 S1 on the left" (T. 185).  Dr. Kelly recommended that plaintiff be admitted to the hospital for conservative treatment consisting of bed rest, muscle relaxants, and lumbar traction (*id.*).  A lumbar myelogram performed on February 1, 1980 revealed a herniated disc at L4-5 (T. 177).  On February 5, 1980, Dr. Kelly performed a laminectomy at L-4, a partial laminectomy at L-5, and a bilateral L5 nerve root compression with removal of herniated nucleus pulposis (T. 182). On April 15, 1980, Dr. Kelly reported that plaintiff was "essentially asymptomatic" following surgery, with some limitation of forward and lateral flexion and extension.  Dr. Kelly advised plaintiff to consult with his employer about returning to work that did not require prolonged standing, lifting, or bending (T. 180).

On May 9, 1980, plaintiff was seen by Dr. Bernard D. Wakefield in the medical department of Arcata Graphics for review of his disability status.  Dr. Wakefield noted that despite "pronounced and very severe Scoliosis which causes gross misalignment of his

entire body," plaintiff claimed not to be in significant discomfort (T. 179).  Dr. Wakefield concluded that plaintiff was permanently disabled from press room work.  He advised plaintiff that his condition was incompatible with the physical requirements for an apprentice "colorplate" position, which involved prolonged standing and bending at the waist over a lay-out table. Plaintiff indicated his desire to try the job anyway, and Dr. Wakefield agreed to a trial period (*id.*).  On October 23, 1981, Dr. Matt Gajewski reported to the State Workers' Compensation Board that plaintiff was permanently partially disabled due to his back condition (T. 142).

On June 11, 1991, plaintiff was involved in a motor vehicle accident, in which he suffered a right shoulder separation along with facial lacerations, fracture of the right eye orbit, and bruised ribs (T. 193-99).  He received physical therapy from the Western New York Physical Therapy Group from July 17, 1991 to August 21, 1991, which  resulted in improved muscle bulk and range of motion, increased strength, and decreased pain (T. 193).

Treatment notes from Dr. Gordon F. Comstock dated June 29, 1999 indicate limited range of motion in plaintiff's neck and back.  Straight-leg raising revealed discomfort at sixty-five and seventy degrees on the right and left sides, respectively, and there was no left ankle jerk.  Upper extremities were normal, with no local tenderness (T. 206).  Dr. Comstock concluded that plaintiff could work with a maximum of twenty pounds, could push or pull up to twenty-five pounds frequently, and could push or pull twenty-six to forty pounds occasionally.  Plaintiff's movements were limited, including bending, squatting, twisting, turning, climbing, crawling, and movement in his upper extremity.  Plaintiff was allowed to sit, stand, and walk frequently, with consistent variation in positions (T. 205).

In reports to the Workers' Compensation Board dated June 29, 1999 (T. 271), September 17, 1999 (T. 272), and January 24, 2000 (T. 273), Dr. Comstock indicated that plaintiff was partially disabled.  Treatment notes dated September 17, 1999 indicate that plaintiff had been doing well on lighter duty for several years, but his back started bothering him again in the spring of 1999 when he returned to the job he was originally injured on (T. 204).   Dr. Comstock noted that plaintiff was partially disabled due to lumbar disc syndrome with left sciatica and loss of left ankle jerk, high frequency hearing loss, and possible tinnitus (T. 203).  On January 24, 2000, Dr. Comstock noted that plaintiff had been partially disabled since his surgery in 1980, had been working with the partial disability until June 1999 when his job changed, and he could no longer perform the physical requirements of the new job.  His back problems had recently been exacerbated by a fall on the ice. According to Dr. Comstock, plaintiff would be able to return to his pre-June 1999 job by mid-February 2000, but remained otherwise "disabled for the currently available employment" (T. 201).  Dr. Comstock prescribed physical therapy (T. 245).

On January 25, 2000, plaintiff began physical therapy with Cynthia Odachowsi, P.T. Initial evaluation revealed minor lumbar pain off and on since the work-related injury in 1979, exacerbated by the recent fall on the ice.  The therapist's assessment was sacro-iliac joint ("SIJ") and lumbar disc dysfunction.  She recommended a four-to-six week course of therapy consisting of moist heat, electric stimulation, mobilizations, and progressive exercise (T. 241-42).  By March 16, 2000, plaintiff was showing gradual improvement, with less pain and less frequency of right leg numbness and tingling.  He still experienced discomfort while extending greater than forward bending, and had general tenderness

throughout the lumbosacral junction (T. 186).  By April 11, 2000, he had less pain overall, but still had an occasional twinge in his right hip and down his right leg (T. 230).

On May 1, 2000, Dr. Robert Keenan performed a consultative orthopedic exam (T. 248-55).  Plaintiff reported chronic difficulties with his lumbosacral spine since his original injury in 1979, described as variable aching or throbbing with radiation into the lower extremities bilaterally, and rated as a 5 on an intensity scale of 1 to 10 (T. 248).  The fall on the ice in January 2000 exacerbated his low back pain, and caused an onset of SIJ dysfunction.  He also reported chronic right shoulder pain since his 1992 motor vehicle accident, which was exacerbated by the January 2000 fall on the ice (T. 249).  Orthopedic examination revealed diminished light touch along the lateral aspect of the right leg, with slightly diminished power in the right foot and toes.  Straight-leg raising was 90 degrees in a seated position bilaterally, with end point low back pain and right leg pain (T. 252).  Plaintiff could walk on his toes and was slightly unsteady while walking on his heels, but his gait was even.  Tenderness occurred over the lumbosacral spine.  Plaintiff complained of right shoulder pain at the end points of right shoulder movement (T. 253).  There was moderate low back pain at the end point of right hip forward flexion, and marked low back pain at the end points of lumbar spine movements (T. 254).  Dr. Keenan's impression was persistent lumbosacral spine disorder since 1979, with surgical intervention in 1980, and chronic right shoulder disorder since 1992. Symptoms of both back and shoulder disorders increased after his fall in January 2000 (T. 255).

X-rays taken on May 1, 2000 revealed status-post L4 laminectomy and partial L5 laminectomy, with slight disc space narrowing at L3-4 and otherwise normal disc spacing; loss of normal lordosis; spondylitic changes with spur formation involving L4 and L5; and

degenerative changes in the sacro-iliac joints bilaterally, right greater than left.  There was no acute fracture or subluxation (T. 256).

Dr. Janis L. Dale, a State agency medical advisor, performed a residual physical functional capacity assessment on May 19, 2000 (T. 257-64).  Dr. Dale stated that plaintiff could: lift and carry fifty pounds occasionally and twenty-five pounds frequently; sit, stand, and walk for about six hours in an eight-hour day (T. 258); and had no other physical limitations (T. 259-61).  Dr. Dale also noted that there were no other examining or plaintiff's treating sources conclusions in the file that were significantly different from her findings (T. 263).

Dr. Sarita Kansal saw plaintiff on several occasions between July 2000 and August 2001 (T. 294-96; 312-16).  Dr. Kansal's treatment notes indicate that at plaintiff's initial visit on July 5, 2000, examination revealed tenderness in the lumbar area.  Straight-leg raising was negative.  Gait, strength and deep tendon reflexes were normal (T. 296).  Dr. Kansal indicated that third-party authorization for an MRI of the lumbar spine was requested (T. 295), but the record does not reflect whether this test was performed.  Dr. Kansal's notes indicate that plaintiff had surgery on November 2, 2000 for removal of kidney stones (T. 294).  On January 29, 2001, plaintiff reported no further problems associated with the kidney stones, but he was experiencing increasing pain on the left side of his neck and shoulder along with numbness and pain in both hands.  Dr. Kansal diagnosed cervical spondylosis with bilateral carpal tunnel syndrome, and prescribed physical therapy (*id.*).

Plaintiff received physical therapy two to three times a week from February 2, 2001 to March 29, 2001 (T. 278-87).  He reported an 80 percent improvement, but was discharged from treatment after his insurance denied authorization (T. 282).

-12-

In a letter dated July 19, 2001, Dr. Kansal stated that plaintiff:

> has a diagnosis of status post L4 laminectomy and partial L5 laminectomy; degenerative changes in the S-I joints; spondolific [sic] changes with osteophyte formation; cervical spondilosis [sic] with bilateral CTS; chronic pain; pain on the left side of the neck and shoulder; numbness and pain in both hands; low back pain; right side worse than left; pain in the hips; restricted range of motion of back and neck; and bilateral hearing loss, among other symptoms which have prevented him from engaging in substantial gainful employment since June 11, 1999.   It cannot be determined at this time when, if at all, he will be able to return to gainful employment.

(T. 312).

IV.    **Plaintiff's Grounds for Reversal**

A.    **Evaluation of Treating Physicians's Opinions**

Plaintiff contends that the ALJ erred in rejecting the medical opinions of plaintiff's treating physicians, Dr. Comstock and Dr. Kansal.  The Social Security regulations require that the opinion of a claimant's treating physician which reflects judgments about the nature and severity of the claimant's impairments be given more weight than medical opinions from other sources, since treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the impairments, and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 404.1527(d)(2).  The treating source's opinion on the issue of the nature and severity of the claimant's impairments must be given "controlling weight" by the ALJ where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." *Id.*; *see also Rosa*, 168 F.3d at 78-79.

If the opinion of the treating physician as to the nature and severity of the claimant's impairment is not given controlling weight, the regulations require the ALJ to apply several factors to decide how much weight to give the opinion, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  The ALJ must "always give good reasons" in the notice of determination or decision for the weight given to the treating source's opinion, 20 C.F.R. § 404.1527(d)(2), and "cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa*, 168 F.3d at 79 (internal quotation omitted); *see also Rooney v. Apfel*, 160 F. Supp. 2d 454, 465 (E.D.N.Y. August 14, 2001).

> As explained by the Social Security Administration, when the ALJ's determination:
>
> is not fully favorable, *e.g.*, is a denial . . .[,] the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996).

In this case, the ALJ noted that the only statement in the record which reflects a treating physician's opinion as to plaintiff's disability is the July 19, 2001 report of Dr. Kansal (submitted after the hearing), which states that plaintiff's various impairments "have prevented him from engaging in substantial gainful employment since June 11, 1999" (T. 312; *see also* T. 26).  The ALJ gave this opinion "little weight" because it "merely lists

[plaintiff]'s impairments and subjective allegations" without discussing the severity of plaintiff's medical condition, any physical restrictions, or what he could still do despite the restrictions (T. 26).  The ALJ found no evidentiary support for Dr. Kansal's statement that plaintiff was unable to engage in substantial activity as of June 1999, noting that plaintiff's employment had been terminated at that time (*id.*).

Likewise, the ALJ did not give significant weight to Dr. Comstock's opinion that plaintiff was disabled from his past work, finding no explanation for this opinion in the record (*id.*).  The ALJ noted that Dr. Comstock did not find plaintiff to be disabled from all work (*id.*), and referred to Dr. Comstock's own treatment notes which indicated that as of June 1999, plaintiff could frequently sit, stand, walk, and work with twenty pounds (T. 27, 205).  This finding is consistent with Dr. Comstock's January 24, 2000 report, discussed above, which indicates that plaintiff had been working with a "partial disability" until June 1999 when the physical requirements of his job changed, and would have been able to return to his pre-June 1999 job by mid-February 2000 (T. 201), as well as with Dr. Dale's May 2000 residual physical functional capacity assessment (T. 257-64).

In addition, the record reflects that the ALJ recontacted Dr. Comstock in May 2001 (prior to plaintiff's hearing), in accordance with the duty to seek further information where the treating physician's reports contain perceived inconsistencies.  *See, e.g., Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.").  Dr. Comstock responded that he had not seen plaintiff since January 24, 2000, and declined to provide any other information (T. 276).  While the record does not

clearly reflect whether the ALJ directly recontacted Dr. Kansal, updated medical reports submitted by plaintiff's counsel subsequent to the hearing contain Dr. Kansal's July 19, 2001 report, along with a copy of a letter from Dr. Kansal to plaintiff, dated August 17, 2001, in which Dr. Kansal informed plaintiff that she was unable to continue as his physician (T. 316).

Based on this review of the record, the court finds that the ALJ's assessment of the weight to be accorded the opinions of Drs. Comstock and Kansal was accomplished in accordance with the requirements of the regulations and the case law, as outlined above. As demonstrated by the foregoing discussion, the ALJ's decision is sufficiently specific to make clear the weight he gave to the treating sources' medical opinion, and the reasons for that weight, and is otherwise supported by the evidence in the case record.

### B.    Evaluation of Plaintiff's Credibility

Plaintiff also contends that the ALJ erred in evaluating his credibility, especially with respect to his allegations regarding the severity of his pain.  In this regard, ALJ McGuan stated that he had considered plaintiff's testimony and demeanor at the hearing, along with the other medical and nonmedical evidence in the record, and gave some credence to plaintiff's subjective complaints of pain, but not to the degree of severity alleged (T. 26). Rather, the ALJ found that the overall objective medical evidence did not support plaintiff's allegations of severe pain or hearing loss, and concluded that plaintiff's testimony with regard to the severity of his symptoms was "not fully credible" (*id.*).

When assessing a claimant's credibility, the ALJ is required to consider various factors, including: (i) the claimant's daily activities; (ii) the location, duration, frequency, and

-16-

intensity of the pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; (v) treatment, other than medication, received for relief of pain or other symptoms; (vi) any other measures used to relieve the pain or other symptoms (*e.g.*, lying flat on back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c)(3); *see also Crowley v. Barnhart*, 220 F. Supp. 2d 176, 180 (W.D.N.Y. 2002) (citing *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) (while ALJ has discretion to evaluate credibility of claimant and arrive at independent judgment regarding allegations of pain, he must do so in light of medical findings and other evidence regarding true extent of pain alleged)).

In this case, the ALJ noted that plaintiff testified to the performance of a wide range of daily activities associated with normal activity and interaction (T. 26).  He lives alone, cooks, shops, washes laundry and dishes, drives his car, and can dress and groom himself without assistance (*id*).  The ALJ also fully discussed the medical evidence indicating the location, duration, frequency, and intensity of the pain alleged, but found that the evidence did not corroborate plaintiff's allegations (*see, e.g.*, T. 24-26).  The ALJ noted that since his surgery in 1980, plaintiff had only been treated conservatively for his complaints of back, neck, and shoulder pain, and was not prescribed any pain medications.  He took over-the-counter Aleve for pain relief (T. 26).  He received physical therapy on several occasions, always with reported improvement in mobility , decreased pain, and alleviation of numbness and tingling (T. 25).  In addition, the ALJ examined the medical record and found no evidence of disc herniation, nerve root impingement, stenosis, degenerative

-17-

pathology, or other factors which would restrict plaintiff's ability to perform the exertional requirements of a significant number of jobs in the economy, including his past work as a black and white print operator (*see* T. 25, 27-29).

Based on this review, the court finds that the ALJ's credibility analysis was based on the application of the proper legal principles, and amply supported by substantial evidence. Accordingly, the court may not independently examine the record and substitute its own judgment of plaintiff's credibility for that of the Commissioner. *See Williams v. Commissioner of Social Sec.*, 462 F. Supp. 2d 411, 414 (W.D.N.Y. November 28, 2006) (citing *Parker v. Harris*, 626 F.2d 225 (1980)).

### C.    Evaluation of Plaintiff's Combination of Impairments

Plaintiff also contends that the ALJ failed to properly assess the combined effect of plaintiff's exertional and nonexertional impairments on his ability to perform substantial gainful activity. The regulations provide that where a claimant has alleged multiple impairments, the ALJ is obligated to consider the disabling effect of the combination of the impairments without regard to whether any one impairment, if considered separately, would be disabling. *See* 20 C.F.R. § 404.1523; *see also* § 404.1569a(d) (discussing combined exertional and nonexertional limitations); *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995). "In such instances, it is the duty of the [ALJ] to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984), *quoted in Costanzo v. Apfel*, 2000 WL 575660, at *3 (W.D.N.Y. February 8, 2000).

-18-

In this case, the ALJ thoroughly and specifically addressed the combined effect of plaintiff's multiple impairments, including both exertional and nonexertional limitations, in his assessment of plaintiff's residual functional capacity, and gave several well-articulated reasons why the combination of impairments did not render plaintiff unable to do substantial gainful work which exists in the national economy.   Accordingly, the court finds no basis for plaintiff's claim that the ALJ failed to properly consider the disabling effect of the combination of alleged impairments.

### D.      Evaluation of Plaintiff's Ability to Perform Work

Finally, plaintiff contends that the ALJ erred in finding that plaintiff had the residual functional capacity to perform either his past work as a black and white print operator, or any other work.   In this regard, plaintiff again argues that the ALJ failed to give credence to plaintiff's testimony, or to the medical evidence provided by Dr. Kansal, which establishes the effect of plaintiff's pain on his ability to work.   This argument is rejected for the reasons discussed above in sections IV(A) and (B).   As that discussion shows, the ALJ properly considered this evidence in accordance with the statutory requirements for determining eligibility for SSDI benefits, as amplified by the regulations and case law.

Plaintiff further contends that the ALJ, in presenting his hypothetical examples to the vocational expert, failed to fully set forth the extent of plaintiff's limitations.   Cases decided within the Second Circuit have long held that a vocational expert's opinion is only useful when the hypothetical questions posed accurately reflect the capabilities of the claimant. *See, e.g., Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981), *cited in Colon v. Commissioner of Social Sec.*, 2004 WL 1144059, at *6 (N.D.N.Y. March 22, 2004).

-19-

However, it remains the responsibility of the ALJ to determine the extent of the functional limitations to be presented in the hypothetical posed to the vocational expert, and there must be "substantial record evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

In this case, the ALJ noted that when plaintiff's counsel added several nonexertional limitations to the hypothetical–specifically, "frequent lying down or reclining; days when no lifting could be done; and ringing in ears lasting for an hour which affects his ability to concentrate" (T. 29)–the vocational expert testified that there were no jobs available that would accommodate an employee with these limitations (*id.*).  However, the ALJ further noted that these additional nonexertional limitations were based on plaintiff's subjective hearing testimony, which this court has already found was properly assessed by the ALJ in the context of his credibility determination.  Moreover, the ALJ found no medical evidence to support plaintiff's claims that he needed to rest or recline after standing or walking, that there were days when he could do no lifting at all, or that his hearing problem affected his concentration (T. 29).  Upon review of the record, the court finds no reason to question this finding.

Accordingly, in the absence of "substantial record evidence" to support the additional limitations posed by plaintiff's counsel at the hearing, there is no basis for this court to find error in the ALJ's reliance on the vocational expert's testimony as to the availability of work in the economy which plaintiff retained the residual functional capacity to perform.

**<u>CONCLUSION</u>**

Based on the foregoing analysis, and after a full review of the record, the court concludes that the ALJ's determination is supported by substantial evidence, as evaluated under correct legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings (Item 10) is granted, and plaintiff's cross-motion for summary judgment (Item 13) is denied.

The Clerk of the Court is directed to enter judgment in favor of the Commissioner. So ordered.

\s\ John T. Curtin
_____
JOHN T. CURTIN
United States District Judge

Dated:  February    13       , 2007
p:\opinions\02-820.feb607